☐ Original

**CLERK'S OFFICE**
**A TRUE COPY**
Apr 11, 2022
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of                )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )
William McDonald's West Allis residence, vehicle   )
identified as a 2007 blue Ford 500, and person of  )
William A. McDonald (Fully described in Attachment A) )

Case No.  22-M-395 (SCD)

Matter No.: 2021R00111

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   4-25-22
_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Hon. Stephen C. Dries   .
_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   4-11-22 12:55 pm

City and state:   Milwaukee, Wi

Judge's signature

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

*Property and Person to be searched*

The property and person to be searched is further described as follows:

- The premises known as 1705 South 84th Street, Apartment #3, West Allis, Wisconsin, more particularly described as a brown, brick apartment complex.

- The vehicle identified as a 2007 blue Ford Five Hundred bearing VIN# 1FAFP24157G103541 and Wisconsin license plate ALB-7712, in the Eastern District of Wisconsin.

- The person of William A. McDonald (DOB:11/21/1977).

## ATTACHMENT B
### *Property to be seized*

1.      All records relating to violations of 42 U.S.C. § 3631, those violations involving

**WILLIAM A. MCDONALD** and occurring after January 2021, including:

      a.   Any and all documents or materials that contain WILLIAM MCDONALD's handwriting;

      b.   Any and all Cheesecake Factory stationary;

      c.   Documents or records including paycheck stubs or records reflecting employment at the Cheesecake Factory;

      d.   Any and all plastic bags, including the box that the plastic bags are stored in;

      e.   Books, paraphernalia, personal journals, photographs, papers, clothing, wall coverings, documents (electronic or otherwise), or other items that contain evidence of bias or animus toward racial minority groups, as well as evidence that MCDONALD acted criminally because of any victim's race, color, or national origin;

      f.   Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles, including the Subject Vehicle, found thereon during the execution of the warrant, including paid utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

      g.   Records and information relating to the custody, control, and possession of the Subject Vehicle;

      h.   Records and information relating to the identity or location of WILLIAM MCDONALD;

      i.   Any and all paper with torn edges, that can be used for comparison on the torn edges of the hate notes

      j.   Knives, tools, baseball bats, rocks, or any other dangerous weapons or objects that could be used to slash vehicle tires and/or break vehicle windows;

      k.   Any and all electronic devices, such as a cellular telephone, tablet, desktop computers, laptop, external hard drives, thumb drives, etc.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. Records and information described in Paragraphs 1.a.-k. above;

    b. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    c. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    d. evidence of the lack of such malicious software;

    e. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    f. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    g. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    h. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    i. evidence of the times the COMPUTER was used;

    j. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    k. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    l. records of or information about Internet Protocol addresses used by the COMPUTER;

    m. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n. contextual information necessary to understand the evidence described in this attachment.

3. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

5. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

6. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.     During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

CLERK'S OFFICE
A TRUE COPY
Apr 11, 2022
s/ Michael Longley

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

William McDonald's West Allis residence, vehicle
identified as a 2007 blue Ford 500, and person of
William A. McDonald (Fully described in Attachment A)

)
)
)
)
)
)

Case No. **22-M-395 (SCD)**

**Matter No.: 2021R00111**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. §§ 3631 | Criminal Interference with Fair Housing Rights; |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Colleen Brennan, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date: 4-11-22

_____
*Judge's signature*

City and state: Milwaukee, Wi

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Colleen Brennan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1705 South 84th Street, Apartment 3, West Allis, Wisconsin (hereinafter "Subject Premises"), the vehicle identified as a 2007 Ford Five Hundred, bearing VIN #1FAFP24157G103541 (hereinafter "Subject Vehicle"), and the person of William A. MCDONALD (DOB: 11/21/1977), all further described in Attachment A, for the things described in Attachment B.

2.      I have been a Special Agent with the Federal Bureau of Investigation (FBI) since March 2019. I am currently assigned to an FBI squad which investigates civil rights crimes, financial crimes, and public corruption crimes. During my tenure with the FBI, I have participated in investigations into bias-motivated crimes which involve crimes committed based on a victim's race, color, religion, or national origin. In addition, I have been part of bias-motivated crime investigations where the victim was engaged in a federally protected activity including the right to enjoy or occupy a dwelling. I have participated in various surveillance techniques and in the execution of various search, seizure, and arrest warrants. I have been part of investigations where electronic surveillance tools such as basic subscriber, transactional, and location information were utilized to further investigations, while satisfying the legal standards associated with them.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 42 U.S.C. § 3631 (criminal interference with Fair Housing rights) have occurred. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

5.      The FBI is investigating allegations that WILLIAM A. MCDONALD used force or threatened to use force to injure, intimidate, or interfere with his victims' housing rights because of their race, color, or national origin in violation of 42 U.S.C. § 3631. The six victims identified thus far all lived under an approximately one-mile radius of each other in West Allis, Wisconsin. Each of these six victims received notes on their vehicles containing hateful and threatening language referencing their race. Each note was found on the windshield of a victim's vehicle. Each vehicle was damaged at the time the notes were left. Three of the six notes, specifically notes four through six, were placed inside of plastic sandwich bags. When VICTIMS 4, 5, and 6 found the notes on their vehicle, the note was inside of the plastic sandwich bag.

6.      VICTIM 1 is African American and resided at an apartment complex located at 1408 South 79th Street West Allis, Wisconsin. On March 7, 2021, VICTIM 1 parked her vehicle on 79th Street, in front of her apartment complex. On March 7, 2021, VICTIM 1 went out to her vehicle and saw that all four tires of her vehicle had been slashed.

7.      On March 8, 2021, VICTIM 1 returned to her vehicle to find the vehicle's windshield had been broken. There was also a note sitting on the windshield. The note contained the following language written on Cheesecake Factory stationary: "BETTER WATCH WHO THE

2

FUCK YOU TALK SHIT TO UGLY FAT NIGGER BITCH! I KNOW WHERE YOU LIVE. IF I SEE YOU AGAIN, I'LL SLASH YOUR FUCKING THROAT. GET THE FUCK BACK TO THE NORTHSIDE WHERE YOU BELONG FUCKING NIGGER!" The top of the stationary has the following printing on it: "Property of The Cheesecake Factory Restaurants, Inc. Confidential Information. Do not duplicate or distribute outside of this company".

8.  On March 17, 2021, VICTIM 1 found another note on her vehicle. The vehicle was parked outside of her apartment complex on South 79th Street. The note was written on identical Cheesecake Factory stationary and contained the following language: "Your last warning to get the fuck outta my neighborhood before I slash your shit again. No problem with BLACK people. Only problems with ghetto punk NIGGERS like you!" VICTIM 1's front two tires were once again slashed. The bottom of the stationary had the following printing on it: "Property of The Cheesecake Factory Restaurants, Inc. Confidential Information. Do not duplicate or distribute outside of this company".

9.  VICTIM 2 is Puerto Rican and resides in an apartment complex located at 8726 West Mitchell Street, West Allis, Wisconsin. VICTIM 2 has a minor son (VICTIM 3), who is African American. On the morning of October 29, 2021, VICTIM 2 found a note on her vehicle containing the following language: "I'm watching all you piece of shit niggers moving into <u>MY</u> neighborhood. Keep speeding + driving like the dumb disrespectful nigger you are + next time it will be your windshield nigger. Get the fuck back to the ghetto nigger northside + stay there. Take all your monkey friends + family too. That's where you belong." In addition to the note, two of VICTIM 2's vehicle tires were flat. No other damage to VICTIM 2's vehicle was identified, but shards of broken glass were found around her vehicle.

3

10.     VICTIM 4 resided with his girlfriend, VICTIM 5, in an apartment complex located at 8722 West Mitchell Street, West Allis, Wisconsin. VICTIM 4 and 5 also have a minor child, VICTIM 6, who lives with them at this address. VICTIMS 4, 5, and 6 are all African American. On February 3, 2022, their vehicle was parked outside their apartment complex on West Mitchell Street. On February 4, 2022, VICTIM 5 started their vehicle and, while driving, noticed the two driver's side tires were flat. VICTIM 5 pulled over near the intersection of West Greenfield Avenue and South 84th Street in West Allis, Wisconsin. VICTIM 5 called VICTIM 4 and asked for help with the tires. VICTIM 4 and his friend met VICTIM 5. VICTIM 4 thought the two flat tires appeared as if they had been stabbed. VICTIM 4's friend found a note on the driver's side windshield. The note contained the following language: "Get the fuck out of <u>MY</u> neighborhood NIGGER!"

11.     On February 22, 2022, at approximately 6:00 p.m., VICTIM 4 and VICTIM 5 left their vehicle parked in front of their previous residence on 8722 West Mitchell Street, West Allis, Wisconsin. On February 23, 2022, VICTIM 4 and VICTIM 5 returned to their vehicle and found that the driver's side window of their vehicle had been broken.

12.     On February 28, 2022, at approximately 7:00 a.m., VICTIM 4 went out to his vehicle and saw both driver's side tires had been slashed. There was also a note placed under the windshield wiper of his vehicle. The note contained the following language: "Keep speeding in <u>MY</u> neighborhood NIGGER. Next time it will be your windshield. Get back to the north side piece of shit NIGGER."

13.     On March 12, 2022, at approximately 10:30 p.m., VICTIM 4 and VICTIM 5 parked their vehicle in front of their previous residence at 8722 West Mitchell Street, West Allis, Wisconsin. At approximately 11:43 a.m. on March 13, 2022, VICTIMS 4 and 5 returned to their

4

vehicle and found their two driver's side tires had been slashed and a note had been left on the vehicle's windshield. The note contained the following language, "You thought I was playing about driving + speeding in <u>MY</u> neighborhood you piece of shit nigger? Get the fuck back to the nigger northside where you belong before I put sand in your gas tank nigger".

14.     On April 2, 2022, VICTIM 7, a female African American who has two African American sons (VICTIM 8 and 9), moved into the same apartment complex as MCDONALD. On April 5, 2022, VICTIM 7 found the word "NIGGER" written in black pen on the front door of her apartment. Additionally, on April 5, 2022, VICTIM 7 found a note had been placed under her apartment door that stated "get the fuck out niggers. Your <u>NOT</u> wanted here." On April 7, 2022, VICTIM 7 found a second note under her apartment door that stated, "stay here + see what the fuck happens nigger." VICTIM 7 stated that the front and back doors of the apartment complex are always locked, and a key is needed for entry, unless you are buzzed in. MCDONALD lives at the Subject Premises and would have a key for entry. Due to the hateful notes and the writing on the  apartment door, VICTIM 8 and VICTIM 9 are no longer living with VICTIM 7 at her apartment out of fear for their safety.

15.     Following the February 28, 2022, incident, the FBI established video surveillance near the area of 8722 West Mitchell Street. On March 14, 2022, I reviewed the video surveillance footage for any evidence related to the incident that was discovered on March 13, 2022. A daylight savings time change went into effect on March 13, 2022. FBI Agents confirmed the camera utilized for the video surveillance properly accounted for the time change and notated the correct time. At 5:43:19 a.m., a dark colored four door sedan (hereinafter "Suspect Vehicle") can be seen driving west on West Mitchell Street, past 8722 West Mitchell, with their headlights on. At 5:43:45 a.m., the Suspect Vehicle drives back east on West Mitchell Street, past 8722 West Mitchell, with the

5

headlights off, but brake lights still on. The Suspect Vehicle stops next to VICTIM 4's vehicle. The brake lights go off at 5:43:47 a.m., as the Suspect Vehicle is right next to the VICTIM 4's vehicle. At 5:43:58 a.m., the Suspect Vehicle's brake lights go back on, and it continues to drive east on West Mitchell Street.

16.     The FBI also determined that a local property management company had video surveillance established near the residence of 8722 West Mitchell Street. Their cameras were set up on the exterior of 8722 West Mitchell Street and were facing south towards West Mitchell Street. On March 15, 2022, an FBI agent went to VICTIM 4's residence, with the property management company, and retrieved the video footage. FBI agents downloaded and reviewed the video footage. The time stamp on the property management company's camera was not accurate, as it did not account for the daylight savings time change on March 13, 2022, and it was also off by several minutes. Although the time stamp was not accurate, the property management camera footage matched the FBI video footage and the same pattern of activity was observed on both cameras. Additionally, the same Suspect Vehicle, described as a dark colored four door sedan, was observed in the property management footage. The property management footage showed the incident from a different angle, and was from a better vantage point than the FBI video footage. Based off the property management footage, the Suspect Vehicle could be more clearly identified, and was identified as being a dark colored, four door sedan, that was either a 2006 or 2007 Ford 500. The property management video footage also clearly showed an individual exit the Suspect Vehicle and place something under VICTIM 4's driver's side windshield wiper. The individual then reached down and paused, at each driver's side tire, for approximately one second. The individual then reentered the Suspect Vehicle, and the vehicle's brake lights came back on. The Suspect Vehicle then drove east down West Mitchell Street.

17.     On March 15, 2022, while reviewing live video surveillance of the area near 8722 West Mitchell Street, FBI agents identified a blue four door sedan that appeared similar to the Suspect Vehicle, drive east, past 8722 West Mitchell Street. Using the video surveillance recording, FBI agents were able to attain a still frame image of the Suspect Vehicle. On March 15, 2022, FBI agents shared the photo of the Suspect Vehicle with the West Allis Police Department, and requested they attempt to identify the license plate of any vehicles in the area that appeared similar.

18.     On March 15, 2022, the West Allis Police Department provided the FBI with information pertaining to a vehicle they had identified in the area that matched the still image of the Suspect Vehicle, provided to them by the FBI. This vehicle was a blue 2007 Ford Five Hundred, four door sedan, with Wisconsin license plate ALB-7712 (hereinafter referred to as the Subject Vehicle). The Subject Vehicle is registered to owner, WILLIAM A. MCDONALD. The Subject Vehicle was observed parked and unoccupied on the south side of West Mitchell Street, near the Subject Premises. The Subject Vehicle had a registered city parking permit, which was procured on January 3, 2022. Parking records indicate that the Subject Vehicle was designated to be parked at the registered address of the Subject Premises.

19.     The Subject Premises is located within the same city, West Allis, Wisconsin, as all the identified victims. According to Google Maps, the Subject Premises is located approximately 0.7 miles from VICTIM 1's previous residence, approximately 0.3 miles from VICTIM 2 and 3's residence, and approximately 0.2 miles from VICTIM 4, 5, and 6's previous residence. All the identified victims' vehicles were parked on a public street, in close proximity to their residences. As a result of receiving the hate notes, VICTIMS 1, 4, 5, and 6, moved out of their residences and out of the town of West Allis. VICTIMS 1, 4, and 5, all stated that their sole reason for moving

7

was due to the hateful notes and vandalism that happened to their vehicles. Prior to receiving the hateful notes and having their vehicles vandalized, VICTIMs 1, 4, 5, and 6 were all happily living in West Allis, and had no desire to move.

20.     FBI agents reviewed the still image of the Suspect Vehicle and compared it to images taken by the West Allis Police Department of the Subject Vehicle. The Subject Vehicle has a bumper sticker on the upper driver's side trunk. The still image of the Suspect Vehicle depicts a square outline corresponding in size, shape, and location on the upper driver's side trunk in the same location as the Subject Vehicle's bumper sticker. Additionally, the Subject Vehicle has a circular West Allis parking pass affixed to the vehicle between the driver side window and rear driver's side passenger seat window. The Suspect Vehicle image also depicts a circular outline corresponding in size, shape and location with the Subject Vehicle's parking pass.

21.     On March 16, 2022, FBI agents requested a video enhancement of the property management company video surveillance. The request was for an enhancement of the Suspect Vehicle seen on March 13, 2022. On March 16, 2022, FBI agents reviewed the enhanced video. The enhanced video of the Suspect Vehicle confirmed the circle outline of the parking pass between the driver side window and passenger seat behind the driver's side window, and the square outline of the bumper sticker on the upper driver's side of the trunk.

22.     According to information provided by the Wisconsin Department of Transportation, the Subject Vehicle is registered to MCDONALD and the associated registration address is the Subject Premises.

23.     A criminal history records check for MCDONALD showed that in 2003, MCDONALD was arrested for keying the vehicle belonging to his ex-girlfriend's new boyfriend.

8

MCDONALD was also listed as a suspect in damaging the windshields on vehicles at a car dealership he worked at in 2018.

24.     The criminal history records also identified MCDONALD's driver's license as having been issued on November 21, 2019, with an expiration date on November 21, 2027. MCDONALD's driver's license address was updated on September 26, 2021, to the Subject Premises.

25.     I have reviewed information from West Allis Police Department records, which indicate that in November 2021, and December 2021, MCDONALD telephoned the West Allis Police Department approximately 26 different times to report drivers who were speeding and driving recklessly. For each of these telephone calls, MCDONALD telephoned the West Allis Police Department from telephone number 414-299-0700. For one of these telephone calls, on December 7, 2021, MCDONALD telephoned the West Allis Police department to complain about a reckless driver. A West Allis police officer met MCDONALD outside of the Subject Premises and interviewed MCDONALD about his complaint. The interview was captured on the West Allis police officer's Axon body camera. In the video, MCDONALD provided his name, a date of birth of 11/21/1977, and his telephone number of 414-299-0700. When MCDONALD was asked where he lived, MCDONALD pointed to his apartment building and stated that he lived at the Subject Premises. The notes that were left on the windshields of the vehicles of VICTIM 2 and VICTIMs 4 and 5 made references to speeding through the neighborhood. Around the same time of MCDONALD telephoning the West Allis Police Department to report speeding, on October 29, 2021, VICTIM 2 received a note on her car that stated: "Keep speeding + driving like the dumb disrespectful nigger you are." Later in February 2022 and March 2022, VICTIM 4 and VICTIM 5 received notes that referred to speeding, specifically: "Keep speeding in MY neighborhood

9

NIGGER. Next time it will be your windshield. Get back to the north side piece of shit NIGGER."

and "You thought I was playing about driving + speeding in <u>MY</u> neighborhood you piece of shit

nigger? Get the fuck back to the nigger northside where you belong before I put sand in your gas

tank nigger."

26.     According to information provided by WE Energies on March 16, 2022,

MCDONALD has had active utilities at the Subject Premises since September 24, 2021.

MCDONALD's last payment was received on March 21, 2022.

27.     According to information provided by the Wisconsin Department of Workforce

Development, MCDONALD worked at Cheesecake Factory in 2019. According to information

provided by The Cheesecake Factory, notebook stationary that has the disclaimer found on the two

notes left on VICTIM 1's vehicle is not available to the public, and is only available to someone

who worked at the Cheesecake Factory.

28.     Based on a review conducted by FBI agents of the notes received by the victims,

all six notes contain similar word use. The word "my" is capitalized and underlined in four of the

six notes. Additionally, the letters "G" and "g" are distinctively written and appear across all six

notes.

29.     On March 14, 2022, VICTIM 4 and VICTIM 5 were interviewed by multiple news

outlets in the Milwaukee area. In the news articles and videos, it was made known there were

cameras recording the area of 8722 West Mitchell Street. On March 17, 2022, FBI agents

conducted a spot check on the Subject Vehicle. The bumper sticker previously identified on the

Subject Vehicle's upper driver's side of the trunk in video surveillance and in the photos provided

by the West Allis Police Department was removed.

10

30.     On March 18, 2022, at approximately 7:33 a.m., the West Allis Police Department conducted a vehicle stop on MCDONALD for not signaling on a turn, and not wearing a seat belt. MCDONALD was issued a citation. The West Allis Police Department recorded MCDONALD's vehicle stop via body camera and both audio and video were captured. FBI agents reviewed the body camera footage. MCDONALD was driving the Subject Vehicle and provided paperwork to the West Allis Police Department that listed the Subject Vehicle as being registered to MCDONALD. MCDONALD provided his address as the Subject Premises. Additionally, MCDONALD's vehicle was pulled over across the street from the Subject Premises and when MCDONALD was asked where he lived, MCDONALD pointed to the Subject Premises. According to information provided by the West Allis Police Department, during the vehicle stop of MCDONALD, West Allis Police observed a baseball bat and a large sized rock in his passenger seat.

31.     On the body camera footage, MCDONALD told the West Allis police officer that MCDONALD was headed to McDonalds to pick up food to deliver to a DoorDash customer. MCDONALD is a DoorDash driver and delivers food to DoorDash customers. In the video, a red DoorDash insulated bag can be observed in MCDONALD's backseat. According to a review of the DoorDash website, you must be 18 years old, "have an Apple iPhone or Android smartphone," and complete the sign-up process to deliver for DoorDash, also called "Dashing." *See* DoorDash, *Requirements for Dashing* https://help.doordash.com/dashers/s/article/Requirements-forDashing?language=en_US (last viewed April 1, 2022). DoorDash drivers must own an iPhone or Android smartphone for the Dasher App, which is the delivery driver app used by DoorDash delivery drivers. During the vehicle stop, MCDONALD was observed to have an Android smartphone in his possession.

11

32.     During the vehicle stop, a West Allis police officer asked MCDONALD for proof of insurance, and MCDONALD could not find his proof of insurance in his glovebox. MCDONALD then pulled out his cellphone, which appeared to be located next to him in the driver's side door. MCDONALD's cellphone appeared to be an Android smartphone. MCDONALD then used his Android smartphone to find his proof of insurance on the Internet. MCDONALD showed the West Allis police officer the screen of his Android smart phone to show his proof of insurance.

33.     During the vehicle stop, a West Allis police officer asked MCDONALD to sign his name and write down his e-mail address on the citation. MCDONALD signed his name and wrote down his e-mail as WILLIAMANTHONY88@GMAIL.COM. MCDONALD's handwriting in his e-mail address is the same handwriting in the six hate notes, specifically the lowercase letters "a" and "g", which are very distinct. The West Allis police officer asked MCDONALD to provide his telephone number, and MCDONALD verbally provided his telephone number as 414-299-0700.

34.     According to legal process served on Verizon, on the night of February 3, 2022, and into the morning of February 4, 2022, which was the morning when VICTIM 4 and VICTIM 5 found the first note that had been left on their vehicle, MCDONALD's telephone number, telephone number 414-299-0700, had cellular records consistent with being in the geographic area of the Subject Premises.

32.     MCDONALD's e-mail address WILLIAMANTHONY88@GMAIL.COM has the number 88 in the e-mail address. Based on my experience as an FBI agent and according to a database called Hate on Display, on the Anti-Defamation League website: www.adl.org/hate-symbols, which is a database that provides an overview of many of the hate symbols that are most frequently used by a wide variety of white supremacist groups and movements, as well as other

12

types of hate groups, the number 88 is a symbolically important number for white supremacists. The number 88 is a numerical code for "Heil Hitler." H is the eighth letter of the alphabet, so 88 = HH = Heil Hitler. According to the Anti-Defamation League, the number 88 is one of the most commonly used white supremacist symbols and it is used throughout the entire white supremacist movement. White supremacists commonly use the number 88 in tattoos, graphic symbols, or part of a name of a group, publication or website; or as part of a screenname or e-mail address. The West Allis Police Department parking permit system lists MCDONALD's residence as the Subject Premises and his vehicle as the Subject Vehicle, along with WILLIAMANTHONY88@YAHOO.COM as an email address. There are other reasons why MCDONALD might use the number 88 in his e-mail addresses and from my experience, people use their date of birth, home address, or the date when they graduated high school/college, in their e-mail addresses. MCDONALD was born 1977, and he was 11 years old in 1988. The number 88 that MCDONALD uses in his e-mail address is not associated with MCDONALD's date of birth, year that he graduated high school or college, and it is not a number that is in his current or past home addresses, and it is not found in his cellphone number.

33. Based on my training and experience, I know that most individuals keep personal items such as cell phones, handwritten notes, and computers close to them, often on their person, in their residence, or in their vehicle.

35. One of the crimes described in this affidavit, 42 U.S.C. § 3631, requires proof that the subject acted because of the race, color, religion, or national origin of another person. In my training and experience, individuals who participate in bias-motivated crimes often maintain evidence relating to their biases in their homes, including, but not limited, to papers, books, other reading material, posters, printouts, clothing, wall coverings, and/or jewelry. Also, in my training

13

and experience, individuals engaged in bias-motivated criminal conduct often maintain evidence relating to their biases on their personal electronic devices, including cell phones, smartphones, tablets, and/or personal computers. A search of the Subject Premises, the Subject Vehicle, and the person of William A. McDonald more fully described in Attachment A, and searches of any electronic devices found within those places that have been used by MCDONALD, are necessary to identify any evidence of MCDONALD's bias-related crimes.

## FINGERPRINT SENSOR AND FACIAL RECOGNITION

36.     In my training and experience, it is likely that the Subject Premises, the Subject Vehicle, and the person of William A. McDonald will contain an electronic device with fingerprint sensors (referred to as "Touch ID") or facial recognition (referred to as "Face ID"), as discussed below.

37.     Based on my training and experience, I know that many smartphones have the capability to serve as a wireless telephone, digital camera, portable media player, GPS, PDA, and tablet, and that many smartphones are storage mediums, which can connect to the Internet using an IP address.

38.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones, iPads, and MacBook Pros, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

39.     If a user enables Touch ID on a given Apple device, he or she can register multiple fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor,

14

which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device or directly on the screen.

40.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in multiple hours <u>and</u> the passcode or password has not been entered in the last several days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

41.     Fingerprint sensors (such as Touch ID) are also common on other manufacturer's cellular devices, such as the Samsung Galaxy S21, OnePlus 8, 8T, and 8 Pro, Asus ROG Phone 3, Motorola Edge Plus, Samsung Galaxy Note 20, LG V60, and tablets, such as the Samsung Galaxy Tab S7 and the Lenovo Tab P11. Those other devices have similar security safeguards as Apple devices.

42.     I also know from training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of facial recognition in lieu of a numeric or alphanumeric passcode or password. This feature is called Face ID.

43.     If a user enables Face ID on a given Apple device, he or she can register multiple faces that can be used to unlock that device.  The user can then use any of the registered faces to unlock the device by using the device's camera to capture a registered face.

44.     In some circumstances, facial recognition cannot be used to unlock a device that has Face ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Face ID in 4 hours and the passcode or password has not been entered in the last several days. Face ID will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) five unsuccessful attempts to unlock the device via Face ID are made; or (4) after a user has initiated a power off or Emergency SOS feature.

45.     Facial recognition (such as Face ID) is also common on other manufacturer's cellular devices, such as the Huawei Mate, Samsung Galaxy S10, and OnePlus 6T, and tablets, such as the Samsung Galaxy Tab 10.5 and the Microsoft Surface Pro 6. Those other devices have similar security safeguards as Apple devices.

46.     In my training and experience, users of devices that offer fingerprint sensors or facial recognition often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

47.     Based on my training and experience, I know that cellular phones and tablets are in common use, and Touch ID and Face ID are a common feature on cellular phones and tablets.

48.     The passcode or password that would unlock the devices with fingerprint sensors or facial recognition found during the search of the persons, premises, and property is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the device(s) found during the search of the persons, premises, and property to the device's fingerprint sensor or capture the face of the user(s) of the device(s) found during the search of the persons, premises, and property to the device's camera in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint sensors with the use of the fingerprints of the user(s) or facial recognition by capturing the face of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

49.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via a fingerprint sensor, or whose face are among those that will unlock the device via facial recognition. It is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require WILLIAM A. MCDONALD to press his finger(s) against the fingerprint sensor or to present his face to the facial recognition

17

sensor of the relevant device(s) found during the search of the persons, premises, and property in order to attempt to identify the device's user(s) and unlock the device(s).

50.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device with a fingerprint sensor using the fingerprints on thumbs or index fingers.  In the event that law enforcement is unable to unlock the device(s) found in the persons, premises, and property as described above within the number of attempts permitted by the device(s), this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

51.     Due to the information above and below, I request that the Court authorize law enforcement to press the fingers (including thumbs) of William A. McDonald to the fingerprint sensor or to present William A. McDonald's face to the facial recognition sensor of the device(s) found at the persons, premises, and property for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

52.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, the Subject Vehicle, or the person of William A. McDonald in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

53.     *Probable cause.*  I submit that if a computer or storage medium is found on the Subject Premises, the Subject Vehicle, and the person of William A. McDonald there is probable

18

cause to believe those records will be stored on that computer or storage medium, for at least the following reasons: Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

     a. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

     b. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

     c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    54. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises, the Subject Vehicle, or the person of William A. McDonald because:

19

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated

camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

55. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

21

media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

f. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

g. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

h. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

56. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

57. Because it is unknown whether other people share the Subject Premises and the Subject Vehicle as a residence, it is possible that the Subject Premises and Subject Vehicle will

contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## <u>CONCLUSION</u>

58.     I submit that this affidavit supports probable cause for a warrant to search the Subject Premises, the Subject Vehicle, and the person of William A. McDonald described in Attachment A and seize the items described in Attachment B.

## ATTACHMENT A
### *Property and Person to be searched*

The property and person to be searched is further described as follows:

- The premises known as 1705 South 84th Street, Apartment #3, West Allis, Wisconsin, more particularly described as a brown, brick apartment complex.

- The vehicle identified as a 2007 blue Ford Five Hundred bearing VIN# 1FAFP24157G103541 and Wisconsin license plate ALB-7712, in the Eastern District of Wisconsin.

- The person of William A. McDonald (DOB:11/21/1977).

24

**<u>ATTACHMENT B</u>**
*Property to be seized*

1.     All records relating to violations of 42 U.S.C. § 3631, those violations involving

**WILLIAM A. MCDONALD** and occurring after January 2021, including:

    a.  Any and all documents or materials that contain WILLIAM MCDONALD's handwriting;

    b.  Any and all Cheesecake Factory stationary;

    c.  Documents or records including paycheck stubs or records reflecting employment at the Cheesecake Factory;

    d.  Any and all plastic bags, including the box that the plastic bags are stored in;

    e.  Books, paraphernalia, personal journals, photographs, papers, clothing, wall coverings, documents (electronic or otherwise), or other items that contain evidence of bias or animus toward racial minority groups, as well as evidence that MCDONALD acted criminally because of any victim's race, color, or national origin;

    f.  Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles, including the Subject Vehicle, found thereon during the execution of the warrant, including paid utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

    g.  Records and information relating to the custody, control, and possession of the Subject Vehicle;

    h.  Records and information relating to the identity or location of WILLIAM MCDONALD;

    i.  Any and all paper with torn edges, that can be used for comparison on the torn edges of the hate notes

    j.  Knives, tools, baseball bats, rocks, or any other dangerous weapons or objects that could be used to slash vehicle tires and/or break vehicle windows;

    k.  Any and all electronic devices, such as a cellular telephone, tablet, desktop computers, laptop, external hard drives, thumb drives, etc.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  Records and information described in Paragraphs 1.a.-k. above;

b.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.  evidence of the lack of such malicious software;

e.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

g.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i.  evidence of the times the COMPUTER was used;

j.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l.  records of or information about Internet Protocol addresses used by the COMPUTER;

m.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

26

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n. contextual information necessary to understand the evidence described in this attachment.

3.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4.      The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

5.      The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

6.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

27

7.      During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.